Theodore H. Frank (SBN 196332)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org

*Attorneys for Plaintiff Ananda Gupta*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| RAJAN GUPTA, a minor, by and through his next friend ANANDA GUPTA,<br><br>Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>Defendant. | Case No. 2:21-cv-8104<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983** |

Plaintiff Ananda Gupta, as next friend for his 17-year-old son, Plaintiff Rajan Gupta, by and through their counsel, brings this Complaint against the above-named Defendant, his employees, agents, and successors in office, and alleges the following upon information and belief:

**INTRODUCTION**

1. Governor Gavin Newsom signed Friday the most restrictive "bubble zone" speech ordinance ever enacted, SB 742. Californians now face criminal charges if they "knowingly approach" within thirty feet of a person in order to pass a leaflet, display a sign,

protest, or engage in "education, or counseling with, that other person in a public way or on a sidewalk area." SB 742 curtails these core First Amendment rights within "100 feet of the entrance or exit of a vaccination site," which includes nearly every drug store, supercenter supermarket, hospital, health care department, clinic, and mobile clinic in the state.

2.      Not only does the restriction—a 30-foot "bubble"—greatly exceed the limits of the zone courts previously upheld to be constitutional, SB 742 discriminates against the *content* of private speech. The new California Penal Code subsection, § 594.39(d), specifically carves out "labor dispute[s]." In other words, Teamsters can picket a hospital, for example, against vaccine mandates for employees or other labor issues; but political candidates, activists, religious missionaries, and ordinary citizens cannot use the same site to educate, counsel, protest, evangelize, or even approach someone to speak.

3.      Plaintiff Rajan Gupta, 17 years old and represented here by his guardian, next friend, and father Ananda Gupta, does not wish to constrain access to vaccinations. To the contrary, he has twice demonstrated at local CVS pharmacies in order to *combat* vaccine misinformation and *encourage* people to take the safe and efficacious vaccines for SARS-CoV-2, the virus that causes COVID-19. SB 742 restricts Rajan from spreading his pro-vaccination message, by threatening to impose a criminal fine up to $1000 and six months' jail time.

4.      Plaintiff brings this civil rights action against Attorney General Rob Bonta, to vindicate his rights under the First and Fourteenth Amendment to the United States Constitution, which SB 742 infringes both on its face and as applied. Plaintiff seeks an injunction preventing Defendant Bonta, in his official capacity, from enforcing the law.

## PARTIES

5.      Plaintiff Rajan Gupta is, and at all times relevant to this Complaint was, a resident of Los Angeles County, California; a California and United States citizen; and a high school senior. He is under the age of eighteen and sues here by and through his next friend and father, Ananda Gupta, who resides with Rajan in Los Angeles County. Ananda Gupta co-designed Twilight Struggle, a board game where two players take the roles of the United States and the

COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983
DECLARATORY AND INJUNCTIVE RELIEF

Soviet Union during the cold war, which was ranked number one for five consecutive years on the site Board Game Geek and called "the best board game on the planet" by FiveThirtyEight. Ananda was also a senior game designer on the award-winning *XCOM: Enemy Unknown* video game.

6. Defendant Rob Bonta is the Attorney General of California and the chief law officer of the state with "direct supervision over every . . . sheriff and over such other law enforcement officers as may be designated by laws, in all matters pertaining to their respective offices." Cal. Const., art. V, § 13; Cal. Gov't Code § 12500, et seq. If, at any point a district attorney of the State fails to enforce adequately "any law of the State," the Attorney General must "prosecute any violations of the law." Cal. Const., art. V, § 13. Plaintiff sues Defendant for prospective injunctive and declaratory relief, under *Ex parte Young*, 209 U.S. 123 (1908), for depriving Plaintiff of his First and Fourteenth Amendment rights under color of state law by enforcing SB 742. Plaintiff sues Bonta in his official capacity.

7. Defendant, at all times relevant to this suit, is acting under color of law.

## JURISDICTION AND VENUE

8. Plaintiff brings this action under Section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§2201-02, for violations of the First and Fourteenth Amendments to the United States Constitution. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

9. Plaintiff's claims for declaratory and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure, and to issue the injunctive relief requested by Plaintiffs under Rule 65 of the Federal Rules of Civil Procedure; the requested injunctive relief under 28 U.S.C. § 1343(3); and attorneys' fees and costs under 42 U.S.C. § 1988 and/or Cal. Civ. Code § 52.1(i).

10. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiff's claims occurred in this district.

## STATEMENT OF FACTS

### The Effect of SB 742

11.    Because it has an "urgency clause," SB 742 goes into effect immediately upon its signing by the governor, which occurred October 8, 2021.

12.    The bill adds a new section to the California Penal Code, § 594.39. Once chaptered, the new section will read: "It is unlawful to knowingly approach within 30 feet of any person while a person is within 100 feet of the entrance or exit of a vaccination site and is seeking to enter or exit a vaccination site, or any occupied motor vehicle seeking entry or exit to a vaccination site, for the purpose of obstructing, injuring, harassing, intimidating, or interfering with that person or vehicle occupant." § 594.39(a). The bill defines "harassing" to mean "knowingly approaching, without consent, … **for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with, that other person** in a public way or on a sidewalk area." § 594.39(c)(1).

13.    The restriction's impact is not negligible. The 30-foot radius makes pamphleting or ordinary one-on-one conversations impossible. An aspiring political candidate or an activist supporting a citizen's initiative could not gather signatures in a zone covered by § 594.39, which is a serious limitation because many grocery stores are now "supercenters," which contain pharmacies. Entrances to these stores have frequently served as *de facto* modern town squares. SB 742 abolishes them.

14.    Vaccination sites include "the physical location where vaccination services are provided, including, but not limited to, a hospital, physician's office, clinic, or any retail space or pop-up location made available for vaccination services"—*any* vaccine. This means that businesses could feasibly immunize themselves against protests on the public sidewalk outside by offering their employees flu vaccines on-site, as they commonly do.

15.    SB 742 further draws distinctions based on the message that speakers convey by both subject matter and purpose. "It is not a violation" of SB 742 "to engage in lawful picketing arising out of a labor dispute, as provided in Section 527.3 of the Code of Civil Procedure." § 594.39(d). This section in turn forbids California courts from granting a preliminary or

permanent injunction against in-person speech connected to labor disputes, including activities "giving publicity to, and obtaining or communicating information regarding the existence of, or the facts involved, in any labor dispute…" Cal. Code. Civ. P. § 527.3(b)(1). Speakers in a labor dispute may employ "advertising, speaking, patrolling any public street or any place where any person or persons may lawfully be, or by any other method not involving fraud, violence or breach of the peace." *Id.*

16.     Under SB 742, it is a criminal offense to approach within 30 feet of someone near a vaccination site (without the approached party's consent) for the purpose of passing a leaflet or handbill; displaying a sign; or engaging in oral protest, education, or counsel. Cal. Penal Code § 594.39(a), (c)(1). Except the same activity is perfectly legal as long as the leaflet, handbill, sign, protest, education, or counsel is part of a picketing operation arising out of a labor dispute. Thus, the Defendant and his agents must consider the subject matter, function, and purpose of speech in order to provide preferential treatment to the expression of views on one particular subject: labor disputes.

17.     Alternatively, to the extent that Defendant could construe the labor dispute exception to SB 742 as applying to *speakers* involved in a labor dispute rather than the content of the speech, no justification for this exception could be offered without reference to the content of the speech, which is nothing but a content-based regulation in disguise.

18.     Based on the carve-out of labor speech, the comments of legislators during its passage, and the events that expressly inspired SB 742, the law appears to have been adopted in part because legislators disagreed with the potential antivaccination message of speech that might occur near vaccination sites.

19.     While Plaintiff disagrees fiercely with antivaxxers and encourages all eligible Americans to become vaccinated against SARS-CoV-2, the First Amendment does not permit government to restrain views it disagrees with.

COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983
DECLARATORY AND INJUNCTIVE RELIEF

## SB 742's Legislative History

20.    As initially considered by the California Senate Committee on Public Safety on April 20, 2021, SB 742 would have prohibited "obstruction, intimidation, or picketing targeted at a vaccination site" where "picketing" was defined as "protest activities engaged in by a person within 300 feet of a vaccination site." The Senate Public Safety Committee Report flagged a potential Constitutional problem with SB 742: "This bill may be found to restrict speech on the basis of the content of the speech. This bill prohibits picketing 'targeted at' a person [or site] giving, receiving, or providing vaccination services." Ex. A at 3.

21.    According to the bill's author, State Senator Dr. Richard Pan, SB 742 was inspired by an incident at Dodger Stadium on January 30, 2021. In his comments in support of the bill Pan remarked: "Current laws do not adequately balance the rights of individuals seeking healthcare with the First Amendment rights of protesters. In incidents at Dodger Stadium and demonstrations from groups like 'V4V' have resulted in disruptions of vaccine distribution and infringed on individuals' right to essential healthcare." Senate Standing Committee on Public Safety Report, at 2, attached as Exhibit A (url citations omitted).

22.    On April 20, 2021, the Senate Public Safety Committee considered the bill. Catherine Martin of the California Vaccination Coalition spoke in favor of SB 742 and made clear she hoped it would help counter Constitutionally-protected speech by antivaxxers. She asserted that:

> The antivaccine network has worked to spread misinformation about the disease, about masks, and vaccines. Their activities range from setting up tables with antivaccine literature, to protests at mass vaccination sites. One group has been recruiting other Spanish-speakers in their network to go out into the fields to, quote, 'educate' agricultural workers against COVID vaccinations. Other groups have specifically targeted the African American community to highlight past inequities and spread doubt. Not coincidentally, some of the Californians who routinely protest vaccines here at the Capitol were also in Washington D.C. on January 6 holding a … health freedom rally, and some did move on to the Capitol that day.

COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983
DECLARATORY AND INJUNCTIVE RELIEF

Video available online at: https://www.senate.ca.gov/media/senate-public-safety-committee-20210420/video?time[senate-public-safety-committee-20210420]=841.463807 (last accessed Oct. 11, 2021).[1]

23.   Matthew McReynolds of Pacific Justice Institute spoke against the bill, pointing out that the bill would criminalize all manner of protests at vaccination sites. "We doubt that the author intended those consequences, but they are the natural consequences of the current operative text, and therefore we would strongly urge amendments to remove the reference to picketing as well as to focus the bill away from the targeting of sites. The bill goes so much further than what it's been presented as that we believe it would be clearly unconstitutional. Existing law does currently prevent the type of obstruction that has been cited, so there's no need for this bill that goes so much further. … Any site that offers flu shots could immunize itself from protests." https://www.senate.ca.gov/media/senate-public-safety-committee-20210420/video?time[senate-public-safety-committee-20210420]=1339.627335 (last accessed Oct. 11, 2021).

24.   Following public comments, State Senator Scott Wiener spoke in favor of the bill, complaining about "people who … sometimes deny the virus even exists or think it's just like the common cold." https://www.senate.ca.gov/media/senate-public-safety-committee-20210420/video?time[senate-public-safety-committee-20210420]=2164.668846 (last accessed Oct. 11, 2021). Wiener said that physically impeding people was "not First Amendment activity," and "completely unacceptable," without addressing McReynolds' observation that the bill goes much further than physical obstruction. *Id.* Then State Senator Rosilicie Ochoa Bogh asked how long 300 feet was. https://www.senate.ca.gov/media/senate-public-safety-committee-20210420/video?time[senate-public-safety-committee-20210420]=2390.000596 (last accessed Oct. 11, 2021). Someone replied that it was a football field, so Ochoa Bogh followed up to ask whether that was "deeper than" the Capitol. Pan responded that it was

---

[1] For convenience, all video links jump to the portion of the video with the quoted or relevant discussions.

certainly larger than the room they were in, "but I would note you can shout from the back of the room to the front as we've witnessed in past hearings." *Id.* Pan added: "in Dodger Stadium they physically obstructed the entrance, but they were over 300 feet, perhaps, away from sites of vaccination." *Id.* In fact, as discussed below, no physical obstruction by protestors occurred during the Dodger Stadium incident. Ochoa Bogh remarked that if the 300-foot limit seemed a little "daunting," she wanted to know from the opposition what a reasonable limit would be given her view that a "privacy buffer" would be helpful. https://www.senate.ca.gov/media/senate-public-safety-committee-20210420/video?time[senate-public-safety-committee-20210420]=2651.639164 (last accessed Oct. 11, 2021). Matthew McReynolds responded that the Supreme Court has struck down 35-foot buffer zones around abortion clinics. He dryly opined "so the 300-foot buffer zone is fairly legally problematic." https://www.senate.ca.gov/media/senate-public-safety-committee-20210420/video?time[senate-public-safety-committee-20210420]=2817.160338 (last accessed Oct. 11, 2021). Pan replied that it's not about speech but obstruction "just from trying to get to a vaccination site." *Id.* In his closing remarks, Pan said that "I find it quite telling that the lead witness," which he took to be Joshua Coleman, a protestor from the antivaccination group V is for Vaccine, "is actually a man who not only has personally . . . followed me . . . certainly much closer than 35 feet, but also has travelled to New York and D.C. and across the country to personally harass me." Pan said the bill was not about him, but protecting vaccination sites, and he held up what he characterized as printouts from Facebook, "plans from people, including Mr. Coleman, to try to go to vaccination sites and basically cause trouble." https://www.senate.ca.gov/media/senate-public-safety-committee-20210420/video?time[senate-public-safety-committee-20210420]=2983.311654 (last accessed Oct. 11, 2021).

25. The Committee unanimously recommended passage on April 20, so SB 742 was forwarded to the Appropriations Committee due to its possible fiscal impacts.

26. The Appropriations Committee staff reported an unclear impact on the state court and jail systems, and the Committee cleared it for the floor on May 20 after a 6-to-1 vote,

without Committee debate on SB 742 in particular. https://www.senate.ca.gov/media/senate-appropriations-committee-20210520/video?time[senate-appropriations-committee-20210520]=4205.243728 (last accessed Oct. 11, 2021).

27.     On June 2, 2021, Pan presented his bill on the Senate floor. Among other things, Pan referenced an antivaxxer who "plowed through a [vaccination] tent with her car." https://www.senate.ca.gov/media/senate-floor-session-20210602/video?time[senate-floor-session-20210602]=1509.102433 (last accessed Oct. 11, 2021). Senator Wiener spoke in support of the bill and against "concerted efforts to try to dissuade people from taking the vaccine, and we're seeing higher COVID rates in those areas, people still dying." https://www.senate.ca.gov/media/senate-floor-session-20210602/video?time[senate-floor-session-20210602]=1614.311698  (last accessed Oct. 11, 2021). Screaming protestors then disrupted the proceedings, causing a recess. Upon resuming the session, State Senator Andreas Borgeas remarked that he wanted to support the bill, but "picketing is not intimidation, and picketing is not physically obstructive if it's done appropriately." The definition of picketing, he observed, might pose significant Constitutional problems for the bill. https://www.senate.ca.gov/media/senate-floor-session-20210602/video?time[senate-floor-session-20210602]=1761.007388 (last accessed Oct. 11, 2021). Pan replied that the bill just created a buffer zone, and "I think we've just experienced why we need this bill." https://www.senate.ca.gov/media/senate-floor-session-20210602/video?time[senate-floor-session-20210602]=1808.904621 (last accessed Oct. 11, 2021).

28.     The California Senate passed the bill on June 2 in a 33-to-4 vote, which sent the bill to the Assembly. (Borgeas voted present.)

29.     In the Assembly, prior to approval by the Public Safety Committee, SB 742 was amended. Reference to "picketing" and its 300-foot prohibition were deleted, and the proposed addition to the penal code, § 594.39, instead prohibited "harassing" within 100-fee of a vaccination site. It defined "harass" as "the nonconsensual and knowing approach within 30 feet of another person or occupied vehicle for the purpose of passing a leaflet or handbill,

displaying a sign to, or engaging in oral protest, education, or counseling with that other person in a public way or on a sidewalk area." Thus, for the first time SB 742 created a "bubble."

30.     A Public Safety Report disclaimed any hostility to any "one political position relating to vaccines" and avows that "this bill is agnostic to a speaker's message." Assembly Committee on Public Safety Report, attached as Exhibit B, at 7.

31.     The Committee reported that the "knowingly approach" standard was calculated to recognize "that individuals may feel uncomfortable with unwelcome contact in light of the pandemic." Ex. B at 9 (citing Melinda Fakuade, *Crowds Might be Anxiety-Inducing After Covid-19. Here's How to Manage It*, VOX.COM (Mar. 8, 2021)). But the next paragraph of the same report claims that the bill does not implicate "incidental conversations or people walking near each other without the purpose of advocacy, protest, or education." *Id.*

32.     On June 26, 2021, State Senator Pan presented in support of the bill before the Assembly Public Safety Committee. He singled out "anti-vaccination extremists" as the target of his bill. https://www.assembly.ca.gov/media/assembly-public-safety-committee-20210629/video?time[assembly-public-safety-committee-20210629]=2272.954285 (last accessed Oct. 11, 2021). Pan again claimed that an anti-vaccine mob had shut down vaccination at Dodger Stadium and asserted that "these extremists are conducting similar operations all over the state." Pan also noted that vaccines would need to be distributed not only at hospitals and pharmacies, but also "campuses, parking lots, perhaps, malls, other types of places." Catherine Martin of the California Vaccination Coalition again spoke in favor of the bill, reiterating her April 20 comments decrying antivaxxers setting up tables with literature and recruiting protestors. https://www.assembly.ca.gov/media/assembly-public-safety-committee-20210629/video?time[assembly-public-safety-committee-20210629]=2651.537248 (last accessed Oct. 11, 2021). Matthew McReynolds of the Pacific Justice Institute again spoke against the bill, noting that the Supreme Court has never upheld a buffer zone or definition of "harass" as broad as the amended bill. https://www.assembly.ca.gov/media/assembly-public-safety-committee-20210629/video?time[assembly-public-safety-committee-20210629]=4143.55241 (last accessed Oct. 11, 2021). McReynolds observed SB 742 would

reach far beyond COVID-19 vaccination and affect BLM protests and "labor protests to Black Lives Matter protests, animal rights activism, as well as pro-life speech outside of clinics as well as in traditional public forums." *Id.*

33.    Following public comments, Assemblyman Dr. Bill Quirk spoke in qualified support of SB 742. https://www.assembly.ca.gov/media/assembly-public-safety-committee-20210629/video?time[assembly-public-safety-committee-20210629]=6269.631368    (last accessed Oct. 11, 2021). Quirk said that while he would vote in favor of the bill, the opponents had some good points. About the 30-foot limit he said "there's absolutely no evidence I know of—and I've been looking—that you can transmit over 30 feet outside. . . . I really don't think that measure and some others you have in the bill would survive a court challenge." *Id.* He reiterated that he would be voting in support, "but I suggest you change the bill." *Id.* Senator Pan responded that protestors yelling or singing causes transmission at greater distances.

34.    The Assembly Public Safety Committee cited a study and related news articles from March 2020 contending that an unmasked sneeze could transmit droplets 7-8 meters. Ex. B at 6. But these early reports did not consider the lower risk of transmission outside. Moreover, another scientist quoted in one of the articles expressed doubt that the virus was so transmissible. "If you think about it, if this really traveled very efficiently by air, we wouldn't be having this conversation. Everybody would know it's true because everybody would be infected. If it was a 27-foot radius that was a high risk to somebody, this would be a totally different conversation. It's not." Jordan Culver, *6 feet enough for social distancing? MIT researcher says droplets carrying coronavirus can travel up to 27 feet*, USA Today (Mar. 31, 2020) (quoting Dr. Paul Pottinger, an infectious disease professor).

35.    The Public Safety Committee passed the bill 6-to-2.

36.    The Assembly then referred to the Appropriations Committee because it would potentially cost California more than $150,000 annually (the threshold over which a bill must pass through the Appropriations Committee). The Appropriations Committee, through which most bills in California pass, generated a Report finding that the bill might cost California "low hundreds of thousands of dollars annually for increased court costs, including trial costs."

Exhibit C (Appropriations Committee Report), at 2. The Appropriations Committee Report recognized that the new law is "similar" to Cal. Penal Code. §§ 423 *et seq*, the California Freedom of Access to Clinic and Church Entrances Act. *Id.* The differences between the two reveal that SB 742 could easily be tailored to avoid infringing First Amendment rights. The California Freedom of Access to Clinic and Church Entrances Act proscribes only violent or non-violent "physical obstruction," "intimidat[ion]," "injur[y]," or "interfere[nce]" with those entering churches or clinics. Cal. Penal Code. § 423.2(a)-(d). It does not prohibit pure speech in the form of "oral protest" "education" or "counseling." Similarly, Cal. Penal Code § 602.11 proscribes preventing an individual from entering or exiting a health care facility, place of worship or school through "physically detaining" the individual or "physically obstructing" his passage. Again, that law steers clear of First Amendment problems by stipulating that "'Physically' does not include speech." *Id.* at § 602.11(b)(1).

37.     The Appropriations Committee passed SB 742 on August 26 in a 12-to-4 vote. The Committee held no debate on the bill in particular, sending the bill back to the floor along with scores of others.

38.     On September 3, SB 742 was amended into its final form, making some cosmetic changes and one important substantive change. Cosmetically, the amendment added a lengthier preamble to Section 1 and an entirely new Section 3, which confirms no reimbursements are necessary for the act under Section 6 of Article XIII of the California Constitution because it simply creates a new crime or infraction. The amendment also slightly restyled and rearranged definitions for "harassing," "interfering with," "intimidating," and "obstructing." The amendment deleted the definition for "vaccination services," although the term is still used in the passed bill. The amendment also deleted the phrase "making the approach"—that is, that it should be criminal to approach within 30 feet of a person "making the approach" to the entrance to a vaccination site. One of the opponents of the bill, the Right of Life League of Southern California, had observed that it was impossible to know where another person was "approaching" and for what reason. *See* Ex. B, at 11. However, the deletion of this term has

minimal effect because SB 742 still forbid approach to a person "seeking entry or exit to a vaccination site."

39.   Substantively, the amendment added subsection (d) to Cal. Penal Code § 594.39, which reads "It is not a violation of this section to engage in lawful picketing arising out of a labor dispute, as provided in Section 527.3 of the Code of Civil Procedure."

40.   In sponsoring the amendment, Assemblywoman Rebecca Bauer-Kahan characterized the amendments as "technical and clarifying. They also address First Amendment concerns and lastly they clarify lawful picketing arising out of a labor dispute is exempt from the                     bill."              https://www.assembly.ca.gov/media/assembly-floor-session-20210903/video?time[assembly-floor-session-20210903]=9453.455979 (last accessed Oct. 11, 2021). The minority leader said the amendment was opposed and asked for a roll call vote. No further debate occurred on the amendment, which was approved by the Assembly 53-to-13.

41.   On the last week of the legislative session, September 8, the Assembly approved SB 742 54-0, the bare minimum to meet the two-thirds requirement for a bill with an urgency clause. Several representatives spoke in favor of SB 742 and none opposed. Assemblywoman Dr. Akilah Weber said "last week this House overwhelmingly said 'enough is enough' when to comes to the misinformation being espoused online and across other social platforms when we       declared      public      health      misinformation      a      public      health      crisis." https://www.assembly.ca.gov/media/assembly-floor-session-20210908/video?time[assembly-floor-session-20210908]=3687.250422 (last accessed Oct. 11, 2021). None of the legislators who voted "no" on the September 3 amendment voted on the final bill; nearly a third of the assembly did not vote on the bill. Following the vote, it was transmitted back to the Senate.

42.   The California Senate approved the amended bill on the same day, September 8, in a 28-8 vote, following a short debate. In support of the bill, Pan alluded to two incidents where extremists drove their cars into vaccine sites. Pan characterized the Assembly amendments as "narrow[ing] the distance we know airborne and aerosol diseases can be spread, add[ing] declarations and findings, mak[ing] technical changes to ensure the bill is content-

neutral, and clarif[ying] that this bill does not supersede existing regulations on lawful union picketing." https://www.senate.ca.gov/media/senate-floor-session-20210908/video?time[senate-floor-session-20210908]=5935.465587 (last accessed Oct. 11, 2021). Senator Jim Nelson urged opposition to the bill because "it's censoring." https://www.senate.ca.gov/media/senate-floor-session-20210908/video?time[senate-floor-session-20210908]=5978.980611 (last accessed Oct. 11, 2021). Senator Dave Min opined time, place, and manner restrictions can be imposed. "You can't yell 'fire' in a crowded theater, you can't injure people, and I believe this is consistent with the First Amendment." https://www.senate.ca.gov/media/senate-floor-session-20210908/video?time[senate-floor-session-20210908]=6189.646199 (last accessed Oct. 11, 2021).

43.     Governor Gavin Newsom signed the bill on October 8, 2021. *Governor Newsom Issues Legislative Update 10.8.21*: https://www.gov.ca.gov/2021/10/08/governor-newsom-issues-legislative-update-10-8-21/ (last accessed Oct. 11, 2021). California's Secretary of State chaptered the bill as Chapter 737, Statutes of 2021. *See 2021-2022 Session Index to Chapters*: https://admin.cdn.sos.ca.gov/bill-chapters/2021/chapter-number.pdf (last accessed Oct. 11, 2021). Due to its urgency clause, SB 742 is already in effect.

### Incidents Supposedly Supporting SB 742

44.     The bill's author, State Senator Pan, and the Assembly Public Safety Committee Report on SB 742 identified three events across the country that supposedly justify the bill: (1) "extremists disrupted vaccination efforts at Dodger Stadium"; (2) "In Tennessee, a woman plowed through a tent in an effort to disrupt vaccine distribution"; and (3) "A Nevada-based vaccination organization had to cancel two in-person events in December after anti-vaccination activists launched an online harassment campaign against it." Ex. B at 4.

45.     Proponents of the bill repeatedly cited the only in-state example among these three—the Dodger Stadium incident. ProtectUS, an organization affiliated with Pan which was described as "the sponsor of the bill," summarized the incident this way:

> In the most publicized incident, Californians simply seeking the COVID-19 vaccine at Dodger Stadium were stopped by a mob of

COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983
DECLARATORY AND INJUNCTIVE RELIEF

extremists that brought the facility to a halt. Endangering patients and health care workers for nearly an hour, anti-vaxxers worked to intimidate and harass a relatively captive audience. Some participants were in fear during the chaos, as they were in vehicles, unsure of what was happening as they were being yelled at by anti-vaxxers (none of whom were following any CDC COVID-19 safety guidelines).

Ex. A at 6. The California Medical Association later repeated these remarks nearly verbatim. Ex. B at 9-10.

46.    Two of three of the cited incidents involve early COVID mass vaccination events, and the Nevada incident predates the first case of COVID-19 in America. Although Pan repeatedly claimed antivax protests were "escalating," proponents cited no evidence that individuals regularly gathering at the thousands of state pharmacies and medical facilities with crowds sufficiently large to obstruct access.

47.    Proponents of the bill mischaracterized the Dodger Stadium incident. In fact, patients were blocked from entering Dodger Stadium by the Los Angeles Fire Department. Pan's comments in support of the bill (Ex. A at 2) cited the news story *Dodger Stadium's COVID-19 vaccination site temporarily shut down after protesters gather at entrance*, LOS ANGELES TIMES (Jan. 31, 2021), *available online at* https://www.latimes.com/california/story/2021-01-30/dodger-stadiums-covid-19-vaccination-site-shutdown-after-dozens-of-protesters-gather-at-entrance (last accessed Oct. 11, 2021), [https://web.archive.org/web/20210812122005/https://www.latimes.com/california/story/2021-01-30/dodger-stadiums-covid-19-vaccination-site-shutdown-after-dozens-of-protesters-gather-at-entrance]. The story reports that the "Los Angeles Fire Department closed the entrance to the stadium—one of the largest vaccination sites in the country—for about an hour starting just before 2 p.m. as a precaution, officials said." According to the story, no appointments were cancelled, and no arrests were made. Protesters evidently did not enter Dodger Stadium grounds as the Fire Department feared. A 103-minute livestream video cited by the TIMES appears to show perhaps 35 protestors milling around outside the closed gate to

Dodger Stadium. https://youtu.be/485d0NgREAY?t=2562 (jumping to moment in video where streamer approaches protesters approximately 90 feet away from the closed roadway gate) (last accessed on Oct. 11, 2021). Protestors in the video claim that officials closed the gate as they approached the entrance. The streamer observes that a sign at the entrance to Dodger Stadium notices "no trespassing," so could provide cause to arrest protesters entering the vaccination site—if protesters had entered. https://youtu.be/485d0NgREAY?t=2773 (last accessed on Oct. 11, 2021). Some antivaxxers used the opportunity to harangue the captive audience of blocked cars with unfounded claims and conspiracy theories. When officials reopened the gates, traffic resumed flowing through, unhindered by the protesters. https://youtu.be/485d0NgREAY&t=4967 (last accessed on Oct. 11, 2021). Other coverage of the incident confirms that protestors remained peaceful and did not block access to the site. *See Anti-vaccination protest leads to temporary closure of Dodger Stadium entrance*, LOS ANGELES DAILY NEWS (Jan. 30, 2021), *available online at* https://www.dailynews.com/2021/01/30/anti-vaccination-protesters-briefly-shut-down-entrance-to-dodger-stadium-vaccination-site/ (last accessed Oct. 11, 2021).

48.    The Dodger Stadium vaccination site permanently shut down in the spring as early demand for extremely scarce vaccines was sated. *See Dodger Stadium vaccine site to close amid demand slowdown*, LOS ANGELES TIMES (Apr. 30, 2021), *available online at* https://www.latimes.com/california/story/2021-04-30/dodger-stadium-vaccine-site-to-close-amid-shift-to-more-appointment-free-clinics (last accessed Oct. 10, 2021) [https://web.archive.org/web/20211010003656/https://www.latimes.com/california/story/2021-04-30/dodger-stadium-vaccine-site-to-close-amid-shift-to-more-appointment-free-clinics]. Vaccinations shifted toward thousands of neighborhood pharmacies with plenty of vaccines on hand and no need for appointments. *Id.*

49.    Even if the Dodger Stadium protestors *had* blocked access to the site, this activity is already criminal, and penalties for blocking traffic and so forth could certainly be further criminalized without infringing on speech. Cal. Penal Code § 647c proscribes "willfully and maliciously obstruct[ing] the free movement of any person on any street, sidewalk or other

public place"; Section 647 proscribes disorderly conduct; Section 240 proscribes assault; and Section 653.2 proscribes using electronic communications to instill fear or harass. The Assembly was also aware, through a comment of A Voice for Choice Advocacy, that Penal Code §§ 404.6, 408, and 415, respectively prohibit inciting a riot, unlawful assembly, and disturbing the peace. Ex. B at 10.

50.     The out-of-state incidents are utterly irrelevant. It is already unlawful for a driver to intentionally drive through a vaccination tent, as occurred in Tennessee. Finally, that two restaurants in Reno, Nevada, canceled vaccination events in 2019, apparently because they got bad online reviews—before COVID was a pandemic in the United States, and nearly a year before any COVID vaccine was authorized—does not support curtailing First Amendment rights at thousands of locations throughout California. *See Vaccinations events in Nevada canceled amid harassment*, AP (Dec. 29, 2019), *available online at* https://apnews.com/article/a6d02799b643867916a789ff903958bd (last accessed Oct. 10, 2021).

### State-Recognized Science Concerning COVID-19

51.     Reports in support of SB 742 offer two broad rationales in support of the measure, both tied to curbing the COVID-19 epidemic. First, to "protect people who are getting vaccinations from facing intimidation and obstruction" (Ex. B at 9), and second to directly "prevent[] the transmission of disease" by protestors. Ex. B at 6. However, both rationales fly in the face of bill itself and facts California has recognized about the virus.

52.     Contrary to legislative analogies to bills protecting access to Californian churches and reproductive health clinics (*e.g.*, Ex. C at 1), the bill does not merely protect against intimidation or obstruction, but expressly prohibits core speech activities: "passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling." Additionally, SB 742 does not limit itself to COVID-19 vaccination sites, but sites for any vaccine whatsoever, perhaps even businesses with free flu shot offerings for employees.

53.     As for the transmission rationale, SB 742's exceptions prove it to be a pretext. The transmission of COVID-19 does not stop simply because boisterous chanting involves a labor dispute. Nor is labor picketing less of an impediment to anyone entering a vaccination site than is any other "oral protest." Nor is it any less of a disruption to the serenity outside of a vaccination site. In fact, rowdy labor picketing and protesting, often accompanied by singing, chanting, and rambunctious in-person speech can increase the risk of virus transmission. SB 742 expressly permits such labor actions.

54.     The Assembly Public Safety Committee Report claimed that "this bill is narrowly drawn to limit activity that facilitates and accelerates the transmission of all communicable diseases," but this is false. Ex. B at 7. Leafletting, distributing handbills, and displaying a sign can be all done silently and unobtrusively, without posing any increased risk of aerosolized virus transmission or disturbance of those entering or exiting a vaccination site, yet these activities are categorically criminalized.

55.     Outdoor transmission of the virus is particularly unlikely, as California's OSHA recommendations confirm. Facemasks are not required for workers outdoors regardless of vaccination status. *Revisions to the COVID-19 Prevention Emergency Temporary Standards Frequently Asked Questions*, California Department of Industrial Relations (Jun. 18, 2021), *available online at* https://www.dir.ca.gov/dosh/coronavirus/Revisions-FAQ.html (last access Oct. 10, 2021) [https://web.archive.org/web/20211008172314/https://www.dir.ca.gov/dosh/coronavirus/Revisions-FAQ.html]. Employers are required to instruct workers only "that face coverings are recommended for unvaccinated persons outdoors where six feet of physical distancing cannot be maintained." *Id.* Not one hundred feet. Not thirty feet. Six feet. As a non-binding recommendation to employees.

56.     In short, the distances greatly exceed every guideline needed to deter the spread of the virus, and SB 742 is not narrowly tailored to address legitimate concern about the direct spread of COVID-19. SB 742 instead broadly curtails speech outside of myriad public forums. This harms all Californians and the Plaintiff in particular.

**Rajan Gupta's Pro-Vaccine Speech**

57.    Plaintiff Rajan Gupta has twice demonstrated in support of vaccines outside of CVS pharmacies, including one located at 12019 Wilshire Blvd, Los Angeles, CA 90049, near where he lives.

58.    This CVS pharmacy is a "vaccination site" within the meaning of SB 742 because it provides vaccination services, including at least administering the flu vaccine and one or more of the authorized vaccines for SARS-CoV-2, the virus that causes COVID-19.

59.    Most recently, on September 24, 2021, Rajan demonstrated at the street-facing entrance to the Wilshire Boulevard CVS pharmacy distributing flyers in support of the safe and efficacious vaccines against COVID.

60.    Plaintiff demonstrated within 100 feet of the entrances and exits to the pharmacy on the public sidewalk between the pharmacy and Wilshire Boulevard.

61.    In order to distribute his flyers, Rajan approached passing pedestrians. Naturally, Rajan needed to approach much closer than thirty feet without consent in order to successfully pass a flyer to his intended audience. The fliers contained facts dispelling common antivax tropes, and encouraging people to get vaccinated against COVID-19. A true and accurate copy of the flier is attached as Exhibit D.

62.    Many of the people Rajan approached with his flyers were seeking the entrance to CVS, as evidenced by their subsequently entering the pharmacy.

63.    True and accurate photographs of Plaintiff leafletting outside the Wilshire Blvd. CVS taken on September 24, 2021 are shown below.

COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983
DECLARATORY AND INJUNCTIVE RELIEF



64.    Although the virus is less likely to spread outdoors and in disinfecting sunlight, Rajan, who is already vaccinated, wore a face mask and kept conversation with other people to a minimum, so as to avoid potentially generating droplets that might spread viruses like SARS-CoV-2.

65.    The 100-foot radius from the front entrance of the pharmacy encompasses not only to the public sidewalks, most of the rear parking lot, and the public road, Wilshire Boulevard. The area also includes the sidewalk on the *opposite side of the street*, where the photo on the right below was taken,[2] and some of the driveway for Wilshire Motel (left in the photo), which is southwest of the CVS on Wilshire Blvd. An accurate overhead view of the area was adapted from Google Maps, shown below. *See* https://goo.gl/maps/S8TWUTPyV3Xd9gbg6 (last visited Oct. 11, 2021). Note that much of the CVS store is underneath a second-level

---

    [2]    *Available online at:* https://www.yelp.com/biz_photos/cvs-pharmacy-los-angeles-103?select=tuG2BToKB-hKyxqAlZwC3A (last visited Oct. 11, 2021).



66.     Rajan Gupta's demonstrations were well within this radius and conducted at least partially, if not entirely, on public sidewalks.

### Injury

67.     Rajan intends to again in the near future demonstrate in front of this CVS or other neighborhood pharmacies in order to help dispel myths about vaccination and to inform Californians about their First Amendment rights (including publicizing his litigation in support of free speech). Rajan intends such demonstrations to be accomplished through handbills similar to those he distributed on September 24. Handbill distribution will again require Rajan to approach others within 30 feet without their consent to deliver his message.

68.     Rajan's educational demonstrations do not limit the access of other people to vaccination sites for any purpose. Nor does silently approaching other people within 30 feet outdoors promote the spread of the virus.

69.     Rajan does not wish to be arrested, spend up to six months in jail, or pay up to a $1,000 criminal fine.

COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983
DECLARATORY AND INJUNCTIVE RELIEF

70.     Rajan reasonably fears criminal prosecution when he renews his demonstration.

71.     Unless implementation of SB 742 is enjoined, Rajan will be forced to censor himself to avoid criminal citation.

72.     Even if the Defendant were to attempt to assure Rajan that such demonstrations were permitted, given the sweeping prohibition of SB 742, Rajan would not feel comfortable speaking freely and would still reasonably fear criminal liability

## CAUSES OF ACTION

### Count I – Facial Violation of the First Amendment
### (42 U.S.C. § 1983 – Free Speech Clause – Facial)

73.     Plaintiff reasserts and realleges paragraphs 1 through 72 as if fully set forth therein.

74.     According to the First Amendment to the United States Constitution, "Congress shall make no law … abridging the freedom of speech."

75.     The First Amendment is incorporated to apply to the states through the Fourteenth Amendment.

76.     SB 742 constitutes an impermissible and unreasonable restriction on the time, place, or manner of protected speech because it burdens substantially more speech than is necessary to further the government's legitimate interests.

77.     SB 742 chills speech on the basis of content and viewpoint of the speech, imposes criminal liability in contravention of the First Amendment. SB 742 is not content-neutral is because it expressly privileges one form of speech—labor picketing—that has equal or greater propensity to obstruct vaccination sites or spread infection than any other sort of speech that may requires individuals to be within "30 feet" of listeners. SB 742 invites arbitrary, subjective, and viewpoint discriminatory enforcement. In fact, it constitutes viewpoint discrimination by exempting pro-union speech.

78.     SB 742 is substantially overbroad because it vests in prosecutors, including Defendant, unfettered discretion to apply it in a discriminatory manner.

79.     SB 742 is substantially overbroad because it restricts speech having nothing to do with the (already criminal) activities that might obstruct access to more than 10,000 vaccination sites in the state.

80.     SB 742 is not appropriately tailored to any government interest. The state district has no significant legitimate interest in restricting speech activities, including Plaintiff's pro-vaccine demonstrations. The excessive 100-foot perimeters and 30-foot bubbles within the vicinity of tens of thousands of locations in the state, including traditional speech forums, therefore does not achieve any of the state's goals but inhibits citizens from communicating with others to protest, evangelize, or petition government with ballot initiatives of signatures in support of political candidates.

81.     To the extent that SB 742 is constitutional in any of its applications, it is nonetheless substantially overbroad in relation to any legitimate sweep and is facially unconstitutional for that reason.

82.     42 U.S.C. §§ 1983, 1988, and Cal. Civ. Code § 52.1(c) entitle Plaintiff to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining enforcement of SB 742. Unless Defendant is enjoined from enforcing SB 742, Plaintiff will suffer irreparable harm that cannot fully be compensated by an award of monetary damages.

83.     Plaintiff found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(i).

### Count II –Violation of the First Amendment as Applied to Plaintiff
### (42 U.S.C. § 1983 – Free Speech Clause – As Applied)

84.     Plaintiff reasserts and realleges paragraphs 1 through 83 as if fully set forth therein.

85.     Plaintiff's speech, as described in paragraphs 57 through 66 above, is fully protected by the First Amendment.

86.     California's legitimate interests are served in no way by restricting plaintiffs' speech.

COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983
DECLARATORY AND INJUNCTIVE RELIEF

87.   The First Amendment protects against the government; it does not leave citizens at the mercy of *noblesse oblige*. An unconstitutional statute will not be upheld merely because the government promises to use it responsibly.

88.   By reason of SB 742, passed and implemented under color of state law, Defendant has imposed a content and/or viewpoint-based restriction on Plaintiff's speech in violation of the Free Speech Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

89.   Even if Defendant were to attempt to assure Plaintiff that his speech and conduct were permitted under SB 742, given the broad language of the law, Plaintiff would not feel comfortable speaking freely and would still reasonably fear criminal liability.

90.   Such *ad hoc* exemptions would only demonstrate that the law is in fact content and viewpoint based.

91.   42 U.S.C. §§ 1983 and 1988 entitles Plaintiff to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining enforcement of SB 742. Unless Defendant is enjoined from enforcing SB 742, Plaintiff will suffer irreparable harm that cannot fully be compensated by an award of monetary damages.

92.   Plaintiff found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees, as well as reasonable costs of suit, under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(i).

**Count III – Violation of Article I, Section 2(a) of California State Constitution (California Civil Code § 52.1)**

93.   Plaintiff reasserts and realleges paragraph 1 through 92 as if fully set forth therein.

94.   Defendant deprives Plaintiff of the rights secured to him by the California Constitution. Specifically, Defendant's enforcement of SB 742 violates Plaintiff's right to freedom of speech under Article I, Section 2 of the California Constitution.  This was and is a violation of Cal. Civ. Code § 52.1.

95.     Unless enjoined by this Court, Defendant's enforcement of SB 742 will infringe Plaintiff's rights under the California and United States Constitutions and thereby cause irreparable injury for which no adequate remedy of law exists.

96.     Plaintiff found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees, as well as reasonable costs of suit, under Cal. Civ. Code § 52.1(i).

## PRAYER FOR RELIEF

97.     Therefore, Rajan Gupta, by and through his next friend Ananda Gupta respectfully requests the following relief:

   a.   A declaratory judgment that SB 742 facially violates the First and Fourteenth Amendments to the United States Constitution;

   b.   A preliminary injunction prohibiting Defendant and his agents from enforcing SB 742;

   c.   A permanent injunction prohibiting Defendant and his agents from enforcing SB 742;

   d.   An award of attorneys' fees, costs, and expenses in this action; and

   e.   Any other legal or equitable relief to which Gupta may show himself to be justly entitled.


Dated: October 12, 2021          Respectfully submitted,

                                 */s/ Theodore H. Frank*
                                 Theodore H. Frank (SBN 196332)
                                 HAMILTON LINCOLN LAW INSTITUTE
                                 1629 K Street NW, Suite 300
                                 Washington, DC 20006
                                 Voice: 703-203-3848
                                 Email: ted.frank@hlli.org

                                 *Attorneys for Ananda Gupta*

1

2

## VERIFICATION

3    I, Ananda Gupta, declare under penalty of perjury under the laws of the United States

4    of America that the foregoing is true and correct. 28 U.S.C. § 1746.

5

6

7    Ananda Gupta, father and next friend

8                              of Plaintiff Rajan Gupta

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    Case No. ######

28

27
COMPLAINT FOR VIOLATION OF FEDERAL CIVIL
RIGHTS UNDER 42 U.S.C. § 1983